[Filed January 2, 1888.]

## JAMES A. VELSIAN, RESPONDENT, *v.* C. H. LEWIS ET AL., APPELLANTS.

VENDOR—TITLE TO PROPERTY—HOW DIVESTED.—It is the buyer's own fault if he is so negligent as not to ascertain the right of his vendor to sell, and he cannot successfully invoke his *bona fides* to protect himself from liability to the true owner, who can only be divested of his right or title to his property by his own act.

POSSESSION, UNAUTHORIZED—WHAT IS—CONVERSION OF CHATTELS.—A possession taken under a purchase from one without title, and who has himself been guilty of a conversion in disposing of the goods or chattels, is a possession unauthorized and wrongful at its inception, and which in the absence of evil intent in the purchaser cannot make rightful or lawful.

WAREHOUSEMAN—DEMAND—WHEN NECESSARY.—Where wheat was purchased from one without title, and the possession thereof is given the purchaser from a warehouseman, on the order of the seller and without the consent of the depositor of such wheat, *held*, that no previous demand is necessary to maintain an action of trover for its wrongful conversion.

APPEAL from Douglas County.    Affirmed.

*W. R. Willis,* for Appellants.

*J. W. Hamilton,* for Respondent.

LORD, C. J.—This was an action in trover for the conversion of four hundred and twelve bushels of wheat. The complaint is in the usual form. On the ground that it did not state facts, etc., a demurrer was interposed, which being overruled, the defendants served, viz., Merrill and Lewis, filed separate answers, denying specifically each and every material fact alleged therein. Upon issue being thus joined, a trial was had, which resulted in a verdict and judgment for the plaintiff, from which this appeal is taken. The facts out of which the controversy arises are in substance these: The plaintiff had contracted to sell his wheat to one W. F. Owens, to be delivered at the warehouse at Dillard Station, and for which he was to receive his pay when the wheat was delivered. Dillard, who was the keeper of the warehouse, was to clean the wheat and to store it in his warehouse for him. Owens had made an advance of one hundred and fifty dollars to the plaintiff on his wheat, for which he had given his note, but which he paid after his

wheat was taken away without any authority or order from him. The defendant Merrill, who was buying wheat for the defendants Allen and Lewis, as their agent, went to the plaintiff to buy his wheat while he was threshing, but the plaintiff declined to sell, telling the defendant Merrill of his sale to Owens, and the advance he had received, and at the same time declined to receive when the plaintiff offered to pay the amount Owens had advanced. The plaintiff had delivered at the warehouse four hundred and twelve bushels of wheat in two-bushel sacks, marked No. 30, when Owens died. Just prior to this the defendant Merrill had bought of Owens a lot of wheat, and got an order to Dillard for it. A part of it included the wheat in controversy, as appears by the order of Owens to Dillard, and which directs the delivery of the wheat to Merrill, and to be shipped to his order. Dillard accepted the order, and by the directions of Merrill shipped the wheat to Allen and Lewis at Portland. The plaintiff never saw the order from Owens to deliver the wheat to Merrill, nor never asked Merrill, or Allen and Lewis for the wheat. The plaintiff testifies that "Dillard told me his warehouse was getting full, and asked if he could clean and ship that much (four hundred and twelve bushels), of my wheat. I told Dillard he could clean it, but did not tell him to ship it; I did not know who got the wheat except what others told me. I gave no order to take it." Dillard testifies that "I told him (plaintiff) that I had an order from Owens to ship the wheat on Merrill's order. I told him that my warehouse was getting full of wheat, and asked him if I could clean and ship this lot of wheat. He said I could clean it, and I understood him that I could ship it. He did not object to my shipping it on Owens' order. I cleaned it and put it out of the warehouse into the railroad cars to be delivered to Allen and Lewis at Portland." The evidence also shows that the reason the plaintiff made his contract that the money was to be paid when the wheat was delivered was, in his own words: "I had trouble last year about getting my money, and I made this arrangement so that I could get my money when the wheat was sold." Upon this state of facts, as far as relates to the wheat of

the plaintiff, it is clear that Owens sold it to the defendant Merrill as the agent of the defendants Allen and Lewis, without the consent of the plaintiff, and when he had no title to it, and could give no lawful or rightful order for its delivery to any one, and that Dillard exceeded his authority when he accepted such order, and by direction of the defendant Merrill put the wheat aboard of the cars and delivered it to the defendants without the consent of the plaintiff. Nor is this disputed, or that these acts do not constitute a wrongful taking or conversion as against them. But the contention of counsel for the defendants is, that where the purchase is made in good faith, although from one without title, and the possession is taken from one rightfully in possession, that the action of trover for a wrongful conversion is not maintainable without previous demand before suit, unless some subsequent acts of the purchaser make him guilty of a conversion. In a word, he seeks to place the transaction on the same footing as a sale by a bailee or warehouseman, and argues that as the buyer acts in good faith, his possession is lawful, particularly where he takes possession from a warehouseman who has the lawful possession of the goods. Hence he insists there is no wrongful taking or conversion without some other subsequent act of dominion or control inconsistent with the rights of the true owner. It is not perceived, however, how this view can aid the contention of the counsel for the defendants.

At first blush, it may seem strange that one who takes possession of goods or chattels under a contract of purchase, from one who had no right to sell, should be treated as a wrong-doer; but the explanation of the principle lies in the common-law maxim *caveat emptor*, which applies to the transfer of personal property. It is the buyer's own fault, if he is so negligent as not to ascertain the right of the vendor to sell, and he cannot successfully invoke his *bona fides* to protect himself from liability to the true owner, who can only be divested of his rights or title to his property by his own act, or by the operation of law. Every person is bound at his peril to ascertain in whom the real title to property is vested, and, however much diligence he may exert

to that end, he must abide by the consequences of any mistake. (*Gilmore* v. *Newton*, 9 Allen, 171; *Spraight* v. *Hawley*, 39 N. Y. 141; *Hotchkins* v. *Hunt*, 49 Me. 213.) Nothing can be plainer that "no one can sell a right when he himself has none to sell, and that every such wrongful sale, by whomsoever made, whether by thief or bailee, acts in derogation of the rights of the owner and in hostility to his authority, and consequently, can neither acquire themselves, nor confer on the purchaser, any right or title of such owner. Mere possession of another man's property affords no evidence that the person having such possession has power to sell it, and he who purchases or intermeddles . with it must see to it that he is protected by the authority of one who has power to sell." (*Dixon* v. *Caldwell*, 15 Ohio St. 412; *Spraight* v. *Hawley*, *supra;* *Cooper* v. *Newton*, 45 N. H. 337.) A possession taken under a purchase from one without title, and who has himself been guilty of a conversion in disposing of the goods or chattels, is a possession unauthorized and wrongful at its inception, and which the absence of evil intent in the purchaser cannot make rightful or lawful. Such a possession is based on the assumption of a right of property, or a right of dominion over it, derived from the contract of sale; and what is this, in the legal sense, but a wrongful intermeddling or asportation or detention of the property of another? At common law, a conversion is that tort which is committed by a person who deals with chattels not belonging to him, in a manner which is inconsistent with the rights of the lawful owner. (Rapalje & Lawrence's Dictionary.) "Any distinct act of dominion wrongfully exerted over one's property in denial of his right, or inconsistent with it, is a conversion." (Cooley on Torts, 428; *Ramsey* v. *Beezley*, 11 Or. 51.) It consists in the exercise of dominion and control over property inconsistent with, and in denial of the rights of the true owner, or the party having the right of possession. Said Shepley, J.: "The exercise of such a claim of right, or dominion over the property as assumes that he is entitled to the possession, or to deprive the party of it, is a conversion." (*Farwell* v. *Chase*, 37 Me. 290.)

The defendants, by taking possession under their purchase,

assumed an ownership, and exercised a dominion over the property inconsistent with the rights of the plaintiff as the true owner. "The very act," said Lord Ellenborough, "of taking goods from one who has no right to dispose of them is a conversion," and held the action of trover maintainable. (*Hurst* v. *Foster*, 2 Stark. 306.) "And again," said the same learned judge, "the very assuming to one's self the property and right of disposing of another man's goods is a conversion; and certainly a man is guilty of a conversion who takes my property by assignment from another who has no authority to dispose of it; for what is that but assisting the other in carrying his wrongful act into effect?" (*McComtre* v. *Davies*, 6 East, 538.) The taking possession of personal property under a contract of purchase is an act based on the assumption of ownership, or a right of dominion over the thing converted, where the vendor is without title, and although without evil intent, is a conversion for which trover lies without previous demand. The intent with which the wrongful act is done on the part of the defendant is not an essential element of the conversion. It is enough that the true owner has been deprived of his property by the unauthorized act of some person who assumes dominion or control over it. It is the effect of the act which constitutes the conversion. (Edwards on Bailment, § 162; Cooley on Torts, 534, 538, 688; *Flanders* v. *Colby*, 28 N. H. 34; *Boyce* v. *Brockway*, 31 N. Y. 490; *Morrill* v. *Molton*, 40 Vt. 242.) Hence the conversion may consist simply of a purchase, even by an innocent party, of goods or other personal chattels from one who has himself been guilty of a conversion in disposing of them, where the buyer takes the goods or chattels into his possession or custody. The authorities to this point are numerous and overwhelming. As trover and replevin are concurrent remedies for the owner whenever the taking is wrongful, any case in which replevin without a demand has been supported is an authority for the maintenance of trover. In *Galvin* v. *Bacon*, 11 Me. 29, the plaintiff being the owner of a horse bailed him to A for use for a limited time, under the expectation of a purchase by the latter. During the time, A, for a

valuable consideration and without notice, sold the horse to B, and he in like manner to the defendant. *Held*, that no previous demand was necessary to enable the owner to maintain replevin against the last purchaser. The court say: "Whoever takes the property of another, without his assent, expressed or implied, or without the assent of some one authorized to act in his behalf, takes it in the eye of the law tortiously. That is unlawful which is not justified or warranted by law; and of this character may be some acts which are not attended with any moral turpitude."

In *Hyde* v. *Noble*, 13 N. H. 494, it was held that a party purchasing property from one who has no right to sell, and holding it to his own use, is guilty of a direct act of conversion, without any demand and refusal. Parker, C. J., said: "The purchase by the defendants, taking possession as they appear to have done, and holding it as their own property, was a conversion. They received the possession from one who had no authority to deliver it to them, under a sale which purported to vest the property in them; and they by their purchase undertook to control it as their own property. This was an assumption of power over it, inconsistent with the rights of the plaintiff. Purchasing property from one who had no right to sell, and holding it to their own use, is a direct act of conversion, without any demand or refusal. Their possession was unlawful at its inception, by reason of the want of authority in Kenniston to make the transfer. It is only where the party obtains the possession lawfully, that it is necessary to show a demand and refusal." In *Freeman* v. *Underwood*, 66 Me. 233, the court say: "But the defendants by the purchase and possession of the berries, although acting in good faith and in ignorance of the want of title in their vendors, assumed thereby an ownership, and exercised a dominion over the property, which rendered them liable in trover to the true owner, without any demand therefor." In *Farley* v. *Lincoln*, 51 N. H. 579, the court say: "At the time of the assignment the plaintiffs were the absolute general owners, and were entitled to the immediate possession of the goods. The assignment passed no title, and

conferred no right upon the defendant in respect of the goods as against the plaintiffs, for the obvious reason that Sanborn had no right or title in them as against the plaintiffs which he could confer on anybody. This being so, the first act of possession exercised by the defendant over them was inconsistent with and in derogation of the plaintiffs' rights. Absolute ownership draws possession after it. If, then, the defendant's act in taking possession was an interference with the plaintiffs' right of actual possession growing out of the ownership, it was in legal effect a disturbance of their constructive possession. The defendant's act in assuming dominion over the property was none the less an invasion of the plaintiffs' right, and none the less a trespass, because he did not intend a wrong, or know that he was committing one. An encroachment upon a legal right must constitute a legal wrong; and it is familiar law that intention is of no account in a civil action brought by one man to recover damages for a wrongful interference with his property by another."

In *Stanley* v. *Gaylord*, 1 Cush. 536, which is a leading case, it was held that a *bona fide* purchaser from one who had the actual possession of the property, but without any right to retain possession as against the lawful owner, and an actual taking of it under such purchase into custody of the purchaser, would subject him to an act of trespass or trover at the suit of the lawful owner without any previous demand. In *Trudo* v. *Anderson*, 10 Mich. 358, it was held that where one's property is disposed of without authority by the person having it in charge, the owner may bring replevin therefor without a previous demand, and that he may do this notwithstanding the property is in the hands of one who has purchased it in good faith, and without notice of the title of the real owner. "Why," said Christian, J., "should the right of the plaintiff to recover his property be made to depend upon the good faith of the defendant, when that good faith is no defense against the plaintiff's right of property or possession when a previous demand has been made. . . . . We do not think the question of intent or good faith in a party receiving possession from a wrongful taker in such cases, and

XV. OR.—35.

where the owner has been guilty of no negligence or wrong, can have any bearing on the right of recovery in a civil suit for the property, or its value; and such is clearly the weight of authority both in England and the United States." And in a late case in the same State (*Hake* v. *Buell*, 50 Mich. 90), it was held that trover for goods sold without the owner's authority or ratification may be brought against the purchaser without formally demanding the goods beforehand. In *Wells* v. *Rayland*, 1 Swan, 501, it is held that where the possession of property is obtained from one who had no right to transfer it, a right of action by the owner against the transferee accrues as soon as the latter acquires possession of it; that the bare taking of possession under such circumstances constitutes a new conversion, and that from the time of the commission of that act the statute will commence running. In *Harpening* v. *Meyer*, 55 Cal. 557, it was held that when the possession of property is obtained — in good faith or otherwise — from one who has no right to transfer it, a right of action by the owner against the transferee accrues as soon as the latter acquires possession, and no demand or further act of conversion is necessary.

So far as can be readily obtained, the weight of authority in England and the United States is that a demand is deemed unnecessary. (See Maine: *Parsons* v. *Webb*, 8 Greenl. 38; *Whipple* v. *Gilpatrick*, 19 Me. 427; *Galvin* v. *Bacon*, 11 Me. 28; *Freeman* v. *Underwood*, 66 Me. 427; *Bodick* v. *Coburn*, 68 Me. 170; *Prime* v. *Cobb*, 63 Me. 202. Massachusetts: *Stanley* v. *Gaylord*, 1 Cush. 536; *Riley* v. *Boston Water-Power Co.* 11 Cush. 11; *Chapman* v. *Cole*, 12 Gray, 141; *Gilmore* v. *Newton*, 9 Allen, 171; *Heckle* v. *Lervey*, 101 Mass. 344; *Carter* v. *Kingman*, 103 Mass. 517; *Bearce* v. *Bowker*, 115 Mass. 129. Michigan: *Trudo* v. *Anderson*, 10 Mich. 357; *Hake* v. *Buell*, 50 Mich. 90. Illinois: *Gibbs* v. *Jones*, 46 Ill. 319. Nevada: *Whitman Mining Co.* v. *Tretle*, 4 Nev. 494; *Ward* v. *Carson R. W. Co.* 13 Nev. 44. California: *Harpening* v. *Meyer*, 55 Cal. 557. Mississippi: *Johnson* v. *White*, 21 Miss. 584. Kansas: *Shoemaker* v. *Simpson*, 16 Kan. 52. Arkansas: *McNeil* v. *Arnold*, 17 Ark. 154. New Hampshire: *Hyde* v. *Noble*, 13 N. H. 494; *Lovejoy* v.

*Jones*, 30 N. H. 164; 51 N. H. 579.  Pennsylvania: *Carey* v. *Bright*, 58 Pa. St. 70.  Vermont: *Riford* v. *Montgomery*, 7 Vt. 411; *Grant* v. *King*, 14 Vt. 367; *Courtes* v. *Kane*, 32 Vt. 232; *Deering* v. *Austin*, 34 Vt. 330; *Bucklin* v. *Beale*, 38 Vt. 653. Georgia: *Robinson* v. *McDonald*, 2 Ga. 116.  Wisconsin: *Eldred* v. *Oconto Co.* 33 Wis. 133; *Oleson* v. *Merrill*, 20 Wis. 487. Maryland: *Harker* v. *Dement*, 9 Gill, 7.  Tennessee: *Wells* v. *Rayland*, 1 Swan, 501.  Oregon: *Surler* v. *Sweeney*, 11 Or. 24. *Contra*, New York: *Barrett* v. *Warren*, 3 Hill, 348; *Tallman* v. *Turck*, 26 Barb. 167.  But see *Bates* v. *Conkling*, 10 Wend. 389.  Indiana: *Wood* v. *Cohen*, 6 Ind. 455.  Connecticut: *Parker* v. *Middlebrook*, 24 Conn. 207.)

It will be noticed that the New York authorities distinguish a delivery to the purchaser, and a taking of the property out of the vendor's possession.  (*Nash* v. *Mosher*, 19 Wend. 431; *Ely* v. *Ehle*, 3 Comst. 506; *Fuller* v. *Lewis*, 13 How. Pr. 49.)  It was said in *Ely* v. *Ehle*, "if the goods be *delivered* by the bailee, trespass lies not against the person to whom they are delivered; but if *sold* or *taken without* delivery, trespass would lie for the taking," etc.  And in *Barrett* v. *Warren*, 3 Hill, 348, it was held to be a general rule that trespass will not lie against one who comes to the possession of goods by *delivery* without fault on his part, although it should turn out that the person who made the delivery had no title and was a wrong-doer.  Without approving these subtle distinctions, still in that view, their application cannot be fitted to the facts of this record.  When Dillard, the warehouseman, accepted the order, and by which he agreed to ship the wheat on Merrill's order and by his direction, he acted in derogation of, and in hostility to the rights of the plaintiff, his bailor, and in violation of the terms of the bailment, which the plaintiff, it would seem, was authorized to treat as terminated.  Their evident purpose was by their act to affect the possession of the wheat in recognition of the rights of ownership derived from the sale by Owens.  Certainly, the bailment terminated when Dillard, by direction of Merrill, and in obedience to his order, took the wheat of the plaintiff from the warehouse without his consent and put it aboard of the

cars, consigned to his principals, the defendants Allen and Lewis, as their property. The effect of such acts or conduct was to restore his bailor, the plaintiff, to his right of possession. Nor were the defendants—considered as one—the mere passive recipients to whom the wheat was delivered. It was they who took the active initiative, and put in motion the overt act which took and put the wheat, or delivered it aboard the cars as their property, whereby the plaintiff lost control of—was deprived of his property. It was not on his own motion that Dillard removed the wheat from the warehouse to the cars; he did it at the instance of the defendant Merrill, the agent of the defendants Allen and Lewis, and he acted for him and upon his order when he wrongfully took the wheat from the place where it was deposited, and put it aboard of the cars for the purpose of asportation, consigned to Merrill's principals, the defendants Allen and Lewis, as their property. So that in this view, it cannot aid the case of the defendants, although the law, as already shown, is decisive of this case, without resort to such subtle distinctions.

There is also another phase of this case to which it is necessary to advert. It is not clear that the defendant Merrill was in the situation of a person who dealt in good faith and in ignorance of the plaintiff's title. Leaving out of the question that after the purchase from Owens and the acceptance of his order on the warehouseman, that the wheat was subsequently taken and removed upon Merrill's order, the whole testimony, as well as his own, tends to show a state of facts from which it might be inferred, on grounds of ordinary business prudence, that he knew the nature of the contract between Owens and the plaintiff. The evidence discloses that he sought the plaintiff for the purpose of purchasing his wheat, and found out from him of his sale to Owens. It is hardly to be supposed that he would offer to pay the advance which Owens had made without making inquiry into the facts, and that when the plaintiff refused to substitute him to the place of Owens, he understood the ground of such refusal. It is probable that he expected, and at that time seemingly without danger from a knowledge, perhaps, of a

fancied security in the character of the person with whom he was dealing, that the contract between Owens and the plaintiff would work out all right, and that what was done might be done without incurring any great risk. Still if he knew that Owens was without title, whatever may have been his reliance in the matter, and bought the wheat, he was bound to know that Owens had no right to give an order for its delivery, to be shipped subject to his order, and that the warehouseman Dillard had no right to accept such order, or deliver the wheat to him for his principals, or to be transported to them without the consent of the plaintiff. In such a case, it would seem that no demand was necessary. Again, I am inclined to think that the defendants are chargeable with notice of the duties which the law imposes on a warehouseman, whose employment in its nature is public, and the relation which he sustains to his depositors understood. And among these duties, the chief of which is, not to deliver the goods or grain deposited to any person other than the depositor, except on his order, or by his consent or authority.

There is no pretense that the defendants, or any of them, had such consent, nor did Dillard, according to the verdict. It would follow, then, if the defendants are chargeable with notice of his want of authority to deliver, even their reception of the wheat would be a wrongful taking, and therefore render a previous demand unnecessary. However this may be, cases of the kind under consideration bear no analogy to, and stand on a different footing from those where the owner of property clothes another with the apparent title or power of disposition, whereby third parties are induced to deal with him. In such cases, the principle is well settled .that such innocent purchasers shall be protected in their title. But the rights of such purchasers do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes or estops him from disputing, as against them, the existence of the title, or power which he caused or allowed to appear to be vested in the party making the sale or conveyance. (*Cowdrey* v. *Vandenburgh,* 101 U. S. 572.) Hence

it has been held where one deposits wheat for storage, knowing that it is to be commingled with wheat purchased by the owner of the warehouse, and that the latter is selling and publicly shipping from the common mass, he thereby confers an apparent ownership and authority to sell, and is estopped to assert his title as against an innocent purchaser in the usual course of business. (*Preston* v. *Wetherspoon*, 109 Ind. 457.) In the case at bar, the party selling had no *indicia* of ownership or power to sell, or the warehouseman authority to deliver, so that neither title was conferred, nor lawful possession given or taken, which precluded the plaintiff as owner from asserting his title and the right to the immediate possession of his property as against the purchasers, however innocent of evil intent, by suit without previous demand. "They received the possession from one who had no authority to deliver it to them, under a sale which purported to vest the property in them; and they by the purchase undertook to control it as their own property. This was an assumption of power over it inconsistent with the rights of the plaintiff." (*Hyde* v. *Noble, supra.*) The possession of the defendants was not a *mere* custody, without reference to the question of title or ownership of the property, as in the case of a common carrier who receives property from one not rightfully entitled to the possession and in ignorance of the title of the true owner; but it was a possession given and taken in pursuance of the contract of sale, and on the assumption of ownership, and the right to exercise dominion and control over it. In such case, good faith, or the absence of evil intent, cannot infuse validity into the transaction, nor make a possession rightful which is exercised in derogation of the rights of the true owner to control and enjoy his property. Nor is the plaintiff "bound to tender an issue, or litigate a question upon the grievance or innocence of a party who contests his right to the property," and by his evidence shows that he claimed it adversely to him.

The judgment must be affirmed.